Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 30 2012, 9:22 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ELLEN M. O'CONNOR**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KELLY A. MIKLOS**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL MANGAN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1110-CR-555 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Grant Hawkins, Judge
Cause No. 49G05-1007-MR-57947

**July 30, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

Michael Mangan ("Mangan") was convicted in Marion Superior Court of murder and was ordered to serve fifty-five years in the Department of Correction. Mangan appeals his conviction and raises the following restated issues:

I. Whether the trial court abused its discretion when it allowed Dr. Ned Masbaum to testify concerning his understanding of the insanity statute; and,

II. Whether the evidence was sufficient to support the jury's guilty but mentally ill verdict.

We affirm.

**Facts and Procedural History**

In 2010, Mangan lived with Anthony Sauer ("Sauer") in Sauer's home as his roommate. Sauer was in poor health and Mangan helped Sauer maintain his personal hygiene.

On the evening of July 25, 2010, Mangan walked into neighbor Ronald Arthur's garage and asked Arthur to "blow" his head off. Mangan was pulling at his hair, but did not have any blood or visible injuries on his person. Arthur told Mangan to get out of his garage and Mangan walked away.

But Arthur then called out to Mangan that he would get him some help. Mangan again stated that he wanted Arthur to blow his head off and reached for a knife he kept at his side. Another neighbor, Mark Miller, approached Mangan and Arthur. Arthur unsuccessfully tried to calm Mangan down, and then told Miller to call the police. Mangan then walked back to Sauer's home and reached for his knife before walking into the home through the back door.

2

Arthur called 911 while Miller walked toward the front of Sauer's house to get his address. As Miller walked through Sauer's side yard, he saw Sauer lying on the ground. Sauer had been stabbed and was dead.

Mangan also called 911 stating that he needed an ambulance because he had stabbed himself in the head. Mangan told the 911 operator that he had to stab himself because "someone tried to kill me in my brain . . . a cat got a hold of the top of my mind" and was "trying to trap" him in "a dead body." Ex. Vol., State's Ex. 53.

Indianapolis Metropolitan Police Officer Suzanne Binder was dispatched to Sauer's residence at 8:09 p.m. and arrived two minutes later. She knocked repeatedly on the door and announced that she was a police officer. Mangan eventually told her to come inside. Mangan had removed his shirt, and had blood on his head and arms. A knife was sitting near the kitchen sink. When the officer asked Mangan about his head wound, he replied, "I had to do it, the cat was trying to kill me." Tr. p. 139. An officer on the scene observed Sauer's body shortly thereafter, and Mangan was placed in handcuffs. Mangan told another officer that he killed Sauer "because I thought he killed my kids." Tr. p. 156.

Mangan stabbed Sauer twenty-seven times in his chest, neck, back and head. He inflicted seven stab wounds that were severe enough to have caused Sauer's death. Sauer's body was not discovered until at least several hours after his death as evidenced by an insect infestation that had begun in a wound and his body's partial state of rigor mortis.

Mangan was charged with murder on July 26, 2010. Shortly thereafter, Mangan filed a motion for a psychological exam to determine his competence to stand trial and his sanity at the time of the offense. Mangan eventually withdrew his challenge to his competency to stand trial and pursued only an insanity defense at trial.

A jury trial commenced on September 19, 2011. At trial, two court-appointed psychiatrists testified, and Mangan presented the testimony of his own psychiatrist. Two of the three psychiatrists opined that Mangan was unable to appreciate the wrongfulness of his conduct when he stabbed Sauer. The jury found Mangan guilty but mentally ill. On September 29, 2011, Mangan was ordered to serve a fifty-five year sentence in the Department of Correction. Mangan now appeals his murder conviction.

**Discussion and Decision**

The issues presented in this appeal arise out of Mangan's claim that he was insane when he killed Sauer. We first observe that the State met its burden of proving that Mangan murdered Sauer. But, a defendant in Indiana can avoid criminal responsibility by raising and successfully establishing what is commonly referred to as the "insanity defense." Galloway v. State, 938 N.E.2d 699, 708 (Ind. 2010) (citing Ind. Code § 35-41-3-6(a) (2004)). "A successful insanity defense results in the defendant being found not responsible by reason of insanity[.]" Id. (citing Ind. Code §§ 35-36-2-3, -4 (2004)).

The defendant bears the burden of establishing the insanity defense by a preponderance of the evidence. Id. (citing I.C. § 35-41-4-1(b)). To meet this burden, the defendant must establish both: (1) that he suffers from a mental illness, and (2) that this mental illness rendered him unable to appreciate the wrongfulness of his conduct at the

4

time of the offense. Id. (citing I.C. § 35-41-3-6(a)). "Thus, mental illness alone is not sufficient to relieve [a defendant of] criminal responsibility." Id. (citing Weeks v. State, 697 N.E.2d 28, 29 (Ind. 1998)). Instead, a defendant who is mentally ill but fails to establish that he was unable to appreciate the wrongfulness of his conduct may be found guilty but mentally ill. Id. (citing Taylor v. State, 440 N.E.2d 1109, 1112 (Ind. 1982)).

It is within the province of the jury to determine whether the defendant appreciated the wrongfulness of his conduct at the time of the offense. Id. at 709 (citing Thompson v. State, 804 N.E.2d 1146, 1149 (Ind. 2004)). Indiana Code section 35-36-2-2 provides for the use of expert testimony to assist the jury in determining the defendant's insanity, but the jury has extremely wide latitude and such expert testimony is merely advisory. Id. "[E]ven unanimous expert testimony is not conclusive on the issue of sanity." Id. (citing Cate v. State, 644 N.E.2d 546, 547 (Ind. 1994)). And the jury is free to disregard the unanimous testimony of experts and rely instead on conflicting testimony by lay witnesses. Id. (citing Barany v. State, 658 N.E.2d 60, 63 (Ind. 1995)). Further, even if there is no conflicting lay testimony, the jury is free to disregard or discredit the expert testimony. Id. (citing Thompson, 804 N.E.2d at 1149); see also Carson v. State, 807 N.E.2d 155, 161-62 (Ind. Ct. App. 2004).

Because it is the jury's province to weigh the evidence and assess the credibility of witnesses, a finding that a defendant was not insane at the time of the offense warrants substantial deference from reviewing courts. Galloway, 938 N.E.2d at 709 (citing Barany, 658 N.E.2d at 63). Therefore, on appeal, the defendant faces "a heavy burden because he or she 'is in the position of one appealing from a negative judgment.'" Id.

5

(quoting Thompson, 804 N.E.2d at 1149). On appeal, we will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact, even though "more reasonable" inferences might have been made. Id. Although this standard of review is deferential, it is not impossible, and our supreme court has long held that "where the defendant claims the insanity defense should have prevailed, the conviction will be set aside 'when the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed.'" Id. at 709-10 (citing Thompson, 804 N.E.2d at 1149; Barany, 658 N.E.2d at 63-64).

### I. Dr. Ned Masbaum's Testimony

Mangan was diagnosed as suffering from a psychosis by the mental health professionals that testified at trial. But Dr. Ned Masbaum also testified that a self-induced psychosis, which may result from heavy substance and/or alcohol use, is not a mental disease or defect as that term is used in the insanity statute. Mangan argues that Dr. Masbaum's testimony was legally inaccurate, and should not have been admitted at trial.

Dr. Masbaum, a forensic psychiatrist, was appointed by the trial court to examine Mangan. During his testimony, Dr. Masbaum inaccurately stated that a person claiming insanity must prove that he or she is suffering from a **severe** mental disease or defect. Tr. p. 289. As noted by Mangan in his brief, the statute does not require that the mental disease or defect be severe. But the trial court later asked Dr. Masbaum to clarify his testimony after reading the insanity statute. Dr. Masbaum agreed with the trial court's statement that "the quality of mental disease or defect is not part of the definition. . . And

6

for our purposes, a psychosis of whatever grade is, in fact, a mental disease or defect." Tr. p. 321. The jury was also correctly instructed on the insanity statute and the defendant's burden of proof. Appellant's App. p. 69. Therefore, we conclude that Mangan cannot establish that he was prejudiced by Dr. Masbaum's initial mistaken statement that the statute requires proof of a "severe" mental disease or defect.

Dr. Masbaum also testified that Mangan suffered from a psychosis that likely resulted from chronic substance abuse. Further, the doctor opined that a substance abuse induced psychosis "does not meet the definition as a severe mental disease or defect in light of the causative factor of voluntary substance and alcohol abuse." Tr. p. 297. Dr. Masbaum's opinion that Mangan did not suffer from a mental disease or defect, as that phrase is used in the insanity statute, was discussed extensively during the trial court's questioning of the doctor, and during Mangan's subsequent cross-examination. Citing this testimony, Mangan argues that Dr. Masbaum "wrongly asserted any disease or defect had to be . . . involuntary to satisfy the Insanity Statute." Appellant's Br. at 13.

Our supreme court recently addressed this issue in Berry v. State, 49S04-1110-CR-611 (Ind. June 20, 2012). Specifically, the court considered whether "it was contrary to law for the trial court to conclude that Berry's psychotic symptoms were the result of his voluntary abuse of alcohol and not a mental disease or defect." Slip op. at 6.

First, the court observed that temporary mental incapacity produced by voluntary intoxication is not considered a mental disease or defect under Indiana's insanity statute. Id. at 10.

7

> On the other hand, Indiana recognizes situations where "the ingestion of intoxicants, through voluntary, has been abused to the point that it has produced mental disease." This type of mental disease is now commonly referred to has "settled" or "fixed" insanity. In cases where a defendant's conduct is caused by his or her "settled" or "fixed" insanity, the defendant would be able to meet the mental disease prong of Indiana's insanity statute.

Id. (citations omitted). Noting that the "intersection of voluntary intoxication and insanity is murky at best," the court concluded that it is for the trier of fact "'to determine whether the accused's conduct was the result of a diseased mind -regardless of the source of the disease -or was the result of voluntary intoxication.'" Id. (quoting Jackson v. State, 273 Ind. 49, 52, 402 N.E.2d 947, 949 (Ind. 1980)).

Coincidentally, in Berry, Dr. Masbaum was one of the two court-appointed psychiatrists, and he testified that voluntary alcohol abuse was like the cause of Berry's symptoms. Id. at 8. The doctor specifically testified that Berry "placed himself in the alcohol-induced psychosis by voluntarily abusing alcohol[.]" Id. Also, two lay witnesses testified to Berry's violent nature after he had been drinking. The other two experts attributed Berry's behavior to his bipolar disorder.

After considering the evidence most favorable to the trial court's judgment, our supreme court affirmed the trial court's rejection of Berry's insanity defense. Specifically, the court observed that a "reasonable inference from Dr. Masbaum's detailed testimony on the subject was that Berry's behavior was due to either voluntarily induced alcohol intoxication or voluntarily induced alcohol withdrawal." Id. at 12. Therefore, the trial court "appropriately found that Berry's conduct was not caused by a mental disease or defect[.]" Id. at 13.

8

In the case before us, Dr. Masbaum testified that Mangan had a history of alcohol and substance abuse dating back to age twelve. Although there was no evidence to establish whether Mangan drank alcohol on the date of the offense, Mangan told Dr. Masbaum that he usually drank alcohol until he was drunk and that he was rarely sober. Tr. p. 303. Therefore, the doctor concluded:

> It was my clinical impression at the time he was suffering from a probable substance-induced psychosis due to alcohol or substances at the time of the alleged offenses. This is a mental disorder, however, it's a voluntary disorder in the sense that a person has to drink and abuse substances to get to that state[.]"

Tr. p. 292. Further, Dr. Masbaum testified that in his opinion, a psychosis caused by voluntary substance and/or alcohol abuse does not meet the statutory definition of a mental disease or defect. Tr. p. 297.

As in Berry, Dr. Masbaum's testimony in this case is consistent with the maxim that "temporary mental incapacity produced by voluntary intoxication is not an excuse for a crime." Slip op. at 7. It was within the province of the jury to weigh this testimony with the testimony of the other two experts and lay witnesses to determine whether Mangan suffered from a mental disease or defect when he stabbed Sauer. Finally, we observe that it is probable that the jury did not credit Dr. Masbaum's testimony that Mangan's psychosis was either alcohol induced and/or did not meet the statutory definition of a mental disease or defect, because the jury found Mangan guilty but mentally ill. See Galloway, 938 N.E.2d at 708 (stating "a defendant who is mentally ill but fails to establish that he or she was unable to appreciate the wrongfulness of his or her conduct may be found guilty but mentally ill").

9

## II. Sufficient Evidence

Mangan also argues that the jury's determination that he was not insane when he murdered Sauer is not supported by the evidence. Dr. Masbaum was the only psychiatrist to testify that Mangan was able to appreciate the wrongfulness of his conduct when he stabbed Sauer. The other two psychiatrists reached the opposite conclusion. This conflicting evidence, by itself, is enough to support the jury's guilty but mentally ill verdict. Our supreme court has "consistently held that conflicting credible expert testimony is sufficiently probative of sanity." Galloway, 938 N.E.2d 699, 710 (Ind. 2010) (citing Robinette v. State, 741 N.E.2d 1162, 1167 (Ind. 2001); Weeks v. State, 697 N.E.2d 28, 29 (Ind. 1998); Metzler v. State, 540 N.E.2d 606, 610 (Ind. 1989); Smith v. State, 502 N.E.2d 485, 490 (Ind. 1987); Reed v. State, 479 N.E.2d 1248, 1253 (Ind. 1985)).

But the jury also heard testimony describing Mangan's demeanor on the day of the crime, the fact that Mangan stabbed himself only after his neighbor indicated that he was going to call 911 to get Mangan help, and that Mangan expressed anger at having to take care of Sauer's growing needs. Mangan admitted to one of the responding officers that he messed up and that he killed Sauer. Tr. p. 156. Mangan also tried to clean the knife that he used to stab Sauer and Sauer's body was found in a secluded area to the side of his home. From this evidence, the jury could reasonably conclude that Mangan was able to appreciate the wrongfulness of his conduct and was therefore not insane when he murdered Sauer. Mangan's argument to the contrary is simply a request to reweigh the evidence and credibility of the witnesses.

## Conclusion

Mangan bore the burden of proving his insanity defense by a preponderance of the evidence. Because evidence was presented to the jury from which it could reasonably conclude that Mangan appreciated the wrongfulness of his conduct when he murdered Sauer, we are not convinced that Mangan's insanity defense should have prevailed at trial.

Affirmed.

ROBB, C.J., and BAILEY, J., concur.