## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 29 2016, 7:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald E. C. Leicht
Kokomo, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jennifer M. Wright,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | November 29, 2016<br><br>Court of Appeals Case No.<br>34A02-1604-CR-841<br><br>Appeal from the Howard Superior Court<br><br>The Honorable George A. Hopkins, Judge<br><br>Trial Court Cause No.<br>34D04-1502-F3-17 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Jennifer Wright (Wright), appeals the trial court's judgment, finding her guilty but mentally ill for aggravated battery, a Level 3 felony, Ind. Code § 35-42-2-1.5, after a bench trial.

We affirm.

## ISSUE

Wright raises one issue on appeal, which we restate as: Whether the State established sufficient evidence to support her conviction of guilty but mentally ill beyond a reasonable doubt.

## FACTS AND PROCEDURAL HISTORY

On December 18, 2014, Wright was spending time with Natasha Adams (Adams) and Adams' fiancé, Charles Sanders (Sanders). Wright and Sanders had previously dated, and Sanders was Wright's current landlord. On that day, Adams and Sanders had taken Wright and her husband out to lunch, after which they all returned to Adams' home in Kokomo, Indiana, to listen to music and spend the rest of the day together. At some point, Sanders and Wright's husband went outside, while Adams and Wright remained inside the residence.

Adams went to the kitchen to start preparations for dinner. When she turned around, she saw Wright "standing with a hammer, getting ready to hit." (Transcript p. 14). Adams attempted "to grab the hammer before [Wright] hit [her] in the head and she ended up hitting [Adams] in [her] knee instead." (Tr.

p. 14). Wright "all of a sudden [] just went crazy." (Tr. p. 19). Adams noticed that Wright "knew what she was doing" because she called Adams by her name and cursed at her, "saying she was going to kill [her]." (Tr. pp. 19, 14). Wright hit Adams' left knee with the claw side of the hammer. As a result of the injury, Adams required reconstructive knee surgery and was unable to walk for four to five months after the surgery.

[6] Upon her arrest, Wright was voluntarily admitted to St. Joseph Hospital Trinity House, where she admitted to using methamphetamine two to three weeks earlier. On December 20, 2014, Wright reported that "she had done methamphetamine just the night before and her friend had slid it under the door." (Def. Exh. B, p. 11). When she was told that she would have to submit to a drug screen, "she changed her story and said 'I didn't do it.'" (Def. Exh. B., p. 11). On December 21, 2014, the treating physician reported that Wright felt "disoriented" and still did "not recall [the] event [with the] hammer." (Def. Exh. B, p. 76). Wright was also diagnosed with "Depression NOS" and the physician noted "malingering[1] likely." (Def. Exh. B., p. 76). On December 22, 2014, Wright was again diagnosed with "Depression NOS" and "Unspecified Amphetamine Use DO." (Def. Exh. B., p. 66). The following day, Wright's diagnosis evolved to "Unspecified Psychotic DO" and she was

---

[1] Dr. George Parker testified to the medical meaning of the verb 'to malinger,' as "consciously faking symptoms to achieve a measurable gain[.]" (Tr. p. 43).

prescribed Haldol. (Def. Exh. B., p. 114). Wright was discharged on December 26, 2014, with a primary discharge diagnosis of depression.

[7] On February 10, 2015, the State filed an Information, charging Wright with Count I, aggravated battery, a Level 3 felony, I. C. § 35-42-2-1.5; Count II, battery, a Level 5 felony, I.C. § 35-42-2-1; Count III, battery, a Level 6 felony, I.C. § 35-42-2-1; and Count IV, battery, a Class A misdemeanor, I.C. § 35-42-2-1. On April 21, 2015, Wright filed a motion for psychological examination "to determine her mental health status at the time" of the incident, which was granted by the trial court. (Appellant's App. p. 66). In its order, the trial court appointed Dr. George Parker (Dr. Parker) and Dr. Paul Roberts (Dr. Roberts) "to conduct a psychological evaluation of [Wright] to determine mental disease or defect at the time of the offense[.]" (Appellant's App. p. 68).

[8] On February 9, 2016, the trial court conducted a bifurcated bench trial and competency hearing. Dr. Parker testified that at the time of the incident it appeared that Wright suffered from "some sort of psychotic episode," which was a "relatively short experience of psychosis lasting about a week or so and it appeared to start to resolve on its own[.]" (Tr. pp. 47, 48). Dr. Parker concluded that Wright "suffered from a mental illness" which "rendered her unable to appreciate the wrongfulness of her conduct at the time of the" offense. (Tr. p. 51). On the other hand, Dr. Roberts opined that Wright suffered from a mental disease—a long-standing depression disorder, with "border on personality features"—and could "appreciate the difference between right and wrong." (Tr. p. 77-78). At the close of the evidence, the trial court took the

matter under advisement. On February 10, 2016, the trial court found Wright guilty of Count I, aggravated battery, a Level 3 felony, but mentally ill at the time of the offense. On March 18, 2016, Wright was sentenced to 1,096 days executed at the Indiana Department of Correction.

[9] Wright now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[10] Wright contends that the State failed to establish sufficient evidence to sustain her conviction of guilty but mentally ill beyond a reasonable doubt. Instead, she asserts that the evidence supports a judgment of not guilty by reason of insanity.[2]

[11] To sustain a conviction, the State must prove each element of the charged offense beyond a reasonable doubt. *See* I.C. § 35-41-4-1(a). Even where the State meets this burden, a defendant in Indiana can avoid criminal responsibility by successfully raising and establishing the "insanity defense."[3] *See* I.C. § 35-41-3-6(a). A successful insanity defense results in the defendant being found not responsible by reason of insanity. *See* I.C. § 35-36-2-3.

---

[2] We agree with the State's observation that Wright did not affirmatively plead an insanity defense but merely filed a motion for a psychological evaluation, which was granted by the trial court. However, during a pretrial hearing on November 13, 2015, Wright informed the trial court that the legal posture of the case revolved around the "mental disease or defect statute." (Tr. p. 3).

[3] The rationale underlying the insanity defense is that a legally insane person is unable to form the requisite criminal intent. *See Truman v. State*, 481 N.E.2d 1089, 1089-90 (Ind. 1985) ("[T]he inability to form intent by reason of insanity" is a defense to crime in Indiana.).

[12] The defendant bears the burden of establishing the insanity defense by a preponderance of the evidence. *Galloway v. State*, 938 N.E.2d 699, 709 (Ind. 2010). To meet this burden, the defendant must establish both (1) that he or she suffers from a mental illness and (2) that the mental illness rendered him or her unable to appreciate the wrongfulness of his or her conduct at the time of the offense. *See* I.C. § 35-41-3-6(a). Thus, mental illness alone is not sufficient to relieve criminal responsibility. *See Weeks v. State*, 697 N.E.2d 28, 29 (Ind. 1998). Rather, a defendant who is mentally ill but fails to establish that he or she was unable to appreciate the wrongfulness of his or her conduct may be found guilty but mentally ill. *See, e.g., Taylor v. State*, 440 N.E.2d 1109, 1112 (Ind. 1982).

[13] Whether a defendant appreciated the wrongfulness of his or her conduct at the time of the offense is a question for the trier of fact. *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004). Indiana Code section 35-36-2-2 provides for the use of expert testimony to assist the trier of fact in determining the defendant's insanity. Such expert testimony, however, is merely advisory, and even unanimous expert testimony is not conclusive on the issue of sanity. *Cate v. State*, 644 N.E.2d 546, 547 (Ind. 1994). The trier of fact is free to disregard the unanimous testimony of experts and rely on conflicting testimony by lay witnesses. *Barany v. State*, 658 N.E.2d 60, 63 (Ind. 1995). And even if there is no conflicting lay testimony, the trier of fact is free to disregard or discredit the expert testimony. *Thompson*, 804 N.E.2d at 1149.

[14] Because it is the trier of fact's province to weigh the evidence and assess witness credibility, a finding that a defendant was not insane at the time of the offense

warrants substantial deference from reviewing courts. *See Barany*, 658 N.E.2d at 63. A defendant claiming the insanity defense should have prevailed at trial faces a heavy burden because he or she "is in the position of one appealing from a negative judgment." *Thompson*, 804 N.E.2d at 1149. A court on review will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact, even though a "more reasonable" inference could have been made. *Id.* at 1149-50.

[15] However, Wright now argues that this is "an almost impossible burden," rendering the right of appeal "dim or illusory." (Appellant's Br. p. 7). "Although this standard of review is deferential, it is not impossible, nor can it be." *Galloway*, 938 N.E.2d at 709. The Indiana Constitution guarantees "in all cases an absolute right to one appeal." IND. CONST. art. VII, § 6. "An impossible standard of review under which appellate courts merely 'rubber stamp' the fact finder's determinations, no matter how unreasonable, would raise serious constitutional concerns because it would make the right to an appeal illusory." *Galloway*, 938 N.E.2d at 709 (quoting *Serino v. State*, 798 N.E.2d 852, 856 (Ind. 2003)). As such, our supreme court has long held that where the defendant claims the insanity defense should have prevailed, the conviction will be set aside "when the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed." *Galloway*, 798 N.E.2d at 709.

[16] As a matter of law, a person is either sane or insane at the time of the crime; there is no intermediate ground. *Id*. at 711. The trier of fact therefore has one

of only two options with regard to insanity. *Id.* Its decision must be based on probative evidence, which means evidence that tends to prove or disprove a point in issue. *Id.* An expert witness who is called to testify as to his or her opinion, in an effort to aid the trier of fact, and who testifies that he or she has no opinion does not provide probative evidence. *Id.*

[17] Here, the State called two expert witnesses and one lay witness. Dr. Parker, who evaluated Wright approximately six months after the incident, diagnosed her with an unspecified psychosis, which rendered her unable to appreciate the wrongfulness of her conduct at the time of the offense. On the other hand, Dr. Roberts testified that while Wright suffered from a mental disease, she was nevertheless able to appreciate the difference between right and wrong. Adams, the lay witness, noticed that Wright "knew what she was doing" because she called Adams by her name and cursed at her, "saying she was going to kill [her]." (Tr. pp. 19, 14). Faced with this conflicting testimony, the trial court concluded that Wright was guilty but mentally ill, thereby rejecting Wright's allegation of insanity.

[18] The trial court's conclusion is supported by substantive evidence. As noted by the State, Wright did not attack a random person but instead targeted her ex-boyfriend's fiancée. She intentionally took steps to arm herself with a hammer, rather than entering into a fist fight, and waited until she was alone with Adams. When Wright approached Adams from behind, she got Adams' attention by calling her by her name, and stated that she was "going to kill [her]." (Tr. p. 19). Wright then swung the hammer towards Adams while

uttering Sanders' name. Based on Wright's demeanor, Adams concluded that Wright knew what she was doing when swinging the hammer.

[19] The record reflects that Wright has no history of mental illness or psychosis and that she had previously only been diagnosed with a recurring and long-standing depression. However, Wright did admit to having a long history of drug abuse, which Dr. Parker opined could have contributed to her psychosis. Dr. Roberts clarified that in some situations, drugs have long-lasting effects even after usage has stopped. He believed that Wright suffered from a major depression disorder, but added that those suffering from depression can generally appreciate the difference between right and wrong. Accordingly, based on the evidence presented at trial, we cannot say that the evidence is without conflict and leads only to the conclusion that Wright was insane when the crime was committed.[4] *See Galloway*, 798 N.E.2d at 709.

## CONCLUSION

[20] Based on the foregoing, we conclude that the State presented sufficient evidence beyond a reasonable doubt to support Wright's conviction of guilty but mentally ill.

---

[4] We deny Wright's request to remand this cause to the trial court for "findings that reviewing courts can use to evaluate an appeal." (Appellant's Br. p. 8). "In a criminal case, the judge need not make findings of fact or conclusions of law to explain the mental processes he engaged in as the trier of fact." *Nation v. State*, 445 N.E.2d 565, 570 (Ind. 1983).

Affirmed.

Crone, J. and Altice, J. concur